IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BRANDON PEGG and KRISTINA PEGG,
husband and wife,

     Plaintiffs,

v.                              Civil Action No. 5:13CV173
                                              (STAMP)
NATHAN TYLER KLEMPA, individually and
in his capacity as agent and employee
of the City of Glen Dale Police Department
and GRANT HERRNBERGER, individually and
in his capacity as an agent and employee
of the West Virginia State Police,

     Defendants.


**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT HERRNBERGER'S MOTION FOR SUMMARY JUDGMENT,**
**GRANTING DEFENDANT KLEMPA'S MOTION FOR SUMMARY JUDGMENT,**
**DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT,**
**AND DENYING AS MOOT ALL MOTIONS IN LIMINE**


I.  Procedural History

Brandon Pegg ("Mr. Pegg") and Kristina Pegg ("Mrs. Pegg")
(collectively, "plaintiffs"), assert claims for excessive force,
unlawful detention/arrest, outrage/intentional infliction of
emotional distress, battery, and civil conspiracy pursuant to 42
U.S.C. § 1983, the West Virginia Constitution, and other state
statutes. These claims arise out of a traffic stop that occurred
in December 2012 which was initially performed by defendant Nathan
Tyler Klempa ("Klempa"). Defendant Grant Herrnberger
("Herrnberger") later arrived on the scene in response to Klempa's

call for backup and thus claims against Herrnberger arise from that point forward.

Based on an amended scheduling order, motions in limine were due prior to dispositive motions. Thus, the parties filed several motions in limine. Thereafter, the plaintiffs filed a partial motion for summary judgment, Herrnberger filed a motion for summary judgment, and Klempa filed a motion for summary judgment. The plaintiffs' partial motion for summary judgment addresses the following claims: unlawful arrest of Mr. Pegg (Count III), unlawful detention and arrest of Mrs. Pegg (Count IV), excessive force toward Mr. Pegg (Count V), battery toward Mr. Pegg (Count VII), and battery toward Mrs. Pegg (Count VIII).

## II. <u>Facts</u>

As this is a motion for summary judgment, and this Court will consider the defendants' qualified immunity defense, this Court will consider the facts in the light most favorable to the plaintiffs.

The parties agree that the traffic stop at issue occurred on New Year's Eve, 2012; around 7:00 p.m.; and that the initial stop was conducted because of a burned out license plate light on Mr. Pegg's vehicle. Mr. Pegg confirmed during his deposition that when Klempa requested his license and insurance information, instead of providing the information he responded "What have I done?" ECF No. 50-3 at 43. Mr. Pegg testified that Klempa responded, "Give me

your driver's license and proof of insurance, and I will tell you."
to which Mr. Pegg responded, "This is bullshit." Id. at 43-45.
Further, Mr. Pegg testified that he could not recall exactly what
was said but that Mr. Pegg was "immediately agitated" and that it
was possible that when Klempa first asked for his license and
insurance information Mr. Pegg also stated, "What the hell did I do
this time? This is nuts." Id. at 48-50. Mr. Pegg testified that
after he provided the information to Klempa, Klempa then told him
why he had been pulled over. Id. at 46-47. Mr. Pegg and Mrs. Pegg
both stated that Klempa had not been rude or offensive during this
initial interaction. Id. at 53; ECF No. 50-5 at 40.

Further, Mr. Pegg testified that at this point, Klempa would
not have known who or what was in Mr. Pegg's car. ECF No. 50-3 at
51-52. Additionally, Mr. Pegg stated that when Klempa was talking
to him at the car window "[Klempa] might not be over the roadway.
He's very close . . . If I would open the door, it'd be very close
to the - - the line." Id. at 52. Mr. Pegg also testified that
vehicles were passing by on the roadway at this time. Id.

Mr. Pegg then testified that after being stopped for
approximately five minutes, more police officers arrived. Id. at
64-65. However, Mr. Pegg stated that he believed the entire stop
took over twenty minutes to be completed. Id. at 65. After the
other officers arrived, Mr. Pegg testified that he was asked to
exit his vehicle by Klempa and that he responded "No." Id. at 65-

66.  Mr. Pegg further testified that his door was then opened and he was asked again, by Herrnberger this time, to exit the vehicle to which he responded "Why?"  Id.  Mr. Pegg stated that Klempa's request was in a lower tone and that Herrnberger's request was in a more aggressive tone.  Id. at 68.  Specifically, regarding the use of force by Herrnberger, Mr. Pegg confirmed that the officers opened the car door after Mr. Pegg refused their requests and that Herrnberger unbuckled his seat belt.  ECF No. 50-3 at 66.  Further, Mr. Pegg testified that he got out of the car on his "own free will" after "they" began to jerk him out of the car, or "grabbed" him.  Id. at 71.  Mr. Pegg then freely left the vehicle, and walked freely to the back of the vehicle.  Id. at 67-80.  During this interaction, Mr. Pegg stated that the officers were either on the fog line[1] or over it.  Id. at 72.

After moving to the rear of the vehicle, Mr. Pegg testified that at one point, Herrnberger stated, "When a police officer tells you to do something, you do it."  Id. at 70.  Mr. Pegg stated that after being removed from the vehicle, he followed all other instructions from the officers.  Id. at 77-78.  Mr. Pegg testified that once at the rear of his vehicle, he was asked by Herrnberger if he had anything illegal in the vehicle and he responded "No."

---

[1]A "fog line" is the white line on the right-hand side of a road, separating the lane for travel from the shoulder.  Melanie D. Wilson, "You Crossed the Fog Line!"-Kansas, Pretext, and the Fourth Amendment, 58 U. Kan. L. Rev. 1179, 1213 (2010).

Id. at 81.  Mr. Pegg was then told, by Klempa, that he was under arrest for obstructing an officer to which he responded, "No. I don't feel like I have done anything."  Id. at 81-82.  Mr. Pegg testified that Klempa then placed Mr. Pegg's arms behind his back, handcuffed him, and placed him in Klempa's police cruiser.  Id. at 82.  Mr. Pegg testified after the removal from the vehicle, that other than being handcuffed, patted down, and placed in the police cruiser, he was able to walk freely and was otherwise not physically harmed by the police officers.  Id. at 75-80.

Before Mr. Pegg was placed in the police cruiser, Mrs. Pegg had been yelling to officers through the vehicle window inquiring as to what was going on.  ECF No. 50-5 at 51.  Mrs. Pegg then opened the car door, stuck her head out, and asked why her husband was being placed in handcuffs because "no one was paying attention" to her when she was just speaking through the window.  Id. Herrnberger then returned to the vehicle where Mrs. Pegg was still sitting and told her to shut her door or she might be arrested, that Mr. Pegg was being arrested because he did not do what the officers told him to do, and that officers "do things for our safety and for yours . . . ."  Id. at 50-52.  Mrs. Pegg testified that she then shut her door and then opened it again.  Id. at 52. Herrnberger then told Mrs. Pegg to shut the door or she would go to jail.  Id.  Herrnberger then asked Mrs. Pegg for her driver's license.  ECF No. 48-4 at 83.  Mrs. Pegg stated that her license

was then run through a computer check and returned to her before Herrnberger asked her a second time for her license. Id. at 85. Mrs. Pegg's license was then returned to her a second time and Herrnberger then ordered her to get out of the vehicle. Id. at 87. Mrs. Pegg was then asked by Herrnberger to raise her shirt to reveal her waist and see if she had any weapons. Id. at 87-88.

Mrs. Pegg testified at her deposition that Herrnberger then completed a Terry[2] frisk of her and also asked her if she had any weapons or drugs. Id. at 93; ECF No. 50-5 at 53. Thereafter, Mrs. Pegg asserts that a search of the truck was completed by both Herrnberger and Klempa without Mrs. Pegg's permission and a search of Mrs. Pegg's purse was completed by Klempa with Mrs. Pegg's permission. Id. at 100. Mrs. Pegg testified that Klempa completed a search of her purse, the passenger compartment, and passenger areas of the vehicle. Id. However, Mrs. Pegg stated that Herrnberger was on the driver's side and she could not see what he was doing. Id. Mr. Pegg testified at his deposition that Mrs. Pegg told him that her purse was searched and that the passenger compartment was searched. ECF No. 66-2 at 93-95. Mrs. Pegg also testified that the officers made disparaging remarks about Mr. Pegg's profession and about her father-in-law. ECF No. 50-5.

Mrs. Pegg further stated that Klempa came up to her with a bag of cookie crumbs and asked her if the crumbs in the bag were

---

[2]Terry v. Ohio, 392 U.S. 1 (1968).

"shake" (marijuana), to which she replied it was not.  Id. at 113.

Mr. Pegg testified that Klempa repeated this question to him while

he was in the police cruiser.  ECF No. 50-3.  Mrs. Pegg also

testified that a bag of jalapeno peppers had been ripped open and

that the bag was on the passenger side of the vehicle.  ECF No. 48-

4.  No weapons or contraband were found in either the vehicle or

Mrs. Pegg's purse.  Mrs. Pegg was then free to drive away in the

vehicle.  Mr. Pegg's obstruction charge was later dismissed.

Based on the analysis that follows, this Court finds that the

plaintiffs' partial motion for summary judgment should be denied

and both defendants' motions for summary judgment granted.

Consequently, all pending motions in limine are denied as moot.

## III.  Applicable Law

The party seeking summary judgment bears the initial burden of

showing the absence of any genuine issues of material fact.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "The burden

then shifts to the nonmoving party to come forward with facts

sufficient to create a triable issue of fact."  Temkin v. Frederick

County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied,

502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 247-48 (1986)).  However, as the United States Supreme

Court noted in Anderson, "Rule 56(e) itself provides that a party

opposing a properly supported motion for summary judgment may not

rest upon the mere allegations or denials of his pleading, but

. . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 256.

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Discussion

### A. Qualified Immunity Standards

This Court will consider the defendants' qualified immunity defenses first as this Court finds that the defendants are entitled to qualified immunity and thus the defense is dispositive.

#### 1. Federal Standard

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the

costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200-01 (2001). The defense of qualified immunity allows a defendant to avoid trial and other litigation expenses. Id. Thus, qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. (citation omitted). Accordingly, it is important to resolve immunity questions first so as to fulfill those policy considerations. Id. (citing Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)).

Analysis of a qualified immunity defense by a law enforcement officer requires a two-part inquiry. Saucier, 533 U.S. at 201. The first question is whether the facts alleged, when viewed in the light most favorable to the injured party, "show the officer's conduct violated a constitutional right." Id. The second question is whether the constitutional right was clearly established at the time of the violation. Id. Qualified immunity is abrogated only upon a showing that the officer's conduct violated a constitutional right and that such right was clearly established at the time the conduct occurred. Id. This Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v.

<u>Callahan</u>, 555 U.S. 223, 236 (2009). Thus, where either prong is met, the officer or officers are entitled to summary judgment. <u>Id.</u>

2. <u>West Virginia Standard</u>

The West Virginia Supreme Court has set forth the following test for qualified immunity:

> [I]n the absence of any wilful or intentional wrongdoing, to establish whether public officials are entitled to qualified immunity, we ask whether an objectively reasonable official, situated similarly to the defendant, could have believed that his conduct did not violate the plaintiff's constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?

<u>Hutchison v. City of Huntington</u>, 479 S.E.2d 649, 659 (W. Va. 1996). Thus, state statutory or constitutional claims are subject to the same two-part inquiry as set forth above: "(1) does the alleged conduct set out a constitutional or statutory violation, and (2) were the constitutional standards clearly established at the time in question?" <u>Id.</u> However, under this standard, the defendants' alleged conduct must also be found to not be "fraudulent, malicious, or otherwise oppressive" to the plaintiff. <u>West Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.</u>, 766 S.E.2d 751, 762 (W. Va. 2014). As such, an additional inquiry is required when considering a qualified immunity defense to state claims.

3. <u>General Claims of the Parties</u>

Herrnberger asserts that he is entitled to qualified immunity as it was reasonable for him to believe that his actions were reasonable pursuant to clearly established laws and the underlying

circumstances. Herrnberger cites the following: (1) he had no reason to disbelieve Klempa's statements as to why he stopped the vehicle and that the vehicle was stopped lawfully; (2) his belief that Mr. Pegg was obstructing by refusing to exit the vehicle was reasonable; (3) it was reasonable for Herrnberger to believe, based on Mr. Pegg's behavior, that he could remove him from the vehicle; (4) it was reasonable for Herrnberger to believe he could obtain Mrs. Pegg's license before releasing the vehicle to her and to order her to exit the vehicle given her defiant behavior; and (5) it was reasonable for Herrnberger to frisk Mrs. Pegg given the circumstances.

Klempa argues that he is entitled to qualified immunity because his actions were reasonable and not outside the realm of clearly established law and, furthermore, were not violative of the plaintiffs' constitutional rights. Klempa concedes in his reply that Rodriguez v. United States, 135 S. Ct. 1609, 1615, 191 L.Ed.2d 492 (2015), is clearly established law but contests its application to this case because the underlying traffic stop occurred in 2012. Further, based on the facts, Klempa argues that his actions were reasonable.

The plaintiffs assert that neither Herrnberger nor Klempa are entitled to qualified immunity as the duration of the stop was extended past a point where Mr. Pegg was required to exit the vehicle. The plaintiffs argue that after Klempa had acquired Mr.

Pegg's information, confirmed the validity of his information, and determined that he was only giving Mr. Pegg a warning, the rationale for extending the stop ended and there was no longer a need to control the scene.

Further, the plaintiffs contend that it was unnecessary for Mr. Pegg to exit the vehicle as (1) Klempa has conceded it was unnecessary for Mr. Pegg to see the burned out light bulb, (2) Klempa had already been standing in the lane of traffic talking to Mr. Pegg for an extended time period and thus removing himself from that lane of traffic is not a supported rationale, (3) the cell phone video taken by Mrs. Pegg shows that "safety" considerations were not at issue, and (4) the claimed grounds for removing Mr. Pegg from the vehicle do not appear in the criminal complaint charging Mr. Pegg with obstruction.

Moreover, the plaintiffs assert that Herrnberger is not entitled to qualified immunity as to Mr. Pegg's claims because he failed to familiarize himself with what was going on before pulling Mr. Pegg out of the vehicle and thus incorrectly determined that such action was necessary. The plaintiffs argue that as to Mrs. Pegg's claims, the defendants have not provided any evidence that reasonable suspicion existed for the search of Mrs. Pegg, her personal belongings, or the contents of the vehicle.

In reply, Herrnberger reiterates that Mr. Pegg could be asked to step out of the vehicle based on the initial suspicion for the

traffic stop. Herrnberger argues that this is so because Herrnberger was informed of the basis for the lawful stop, and Mr. Pegg had not received a citation or warning when he was ordered to exit. Further, Herrnberger contends that the plaintiffs have failed to substantiate a claim that Mr. Pegg was asked to exit the vehicle for any other reason other than to address the traffic violation that warranted the stop or to attend to safety concerns. Moreover, Herrnberger argues that the officers' state of mind does not matter as long as their actions were objectively reasonable. As to Mrs. Pegg, Herrnberger argues that the plaintiffs have failed to object to Herrnberger's presentation of the law and facts regarding Mrs. Pegg's claims for unlawful arrest, detainment, and search.

Further, Herrnberger asserts that the plaintiffs failed to respond to Herrnberger's claims that he is entitled to qualified immunity for Counts IV, V, VI, VII, VIII, and IX (unlawful detention and arrest of Mrs. Pegg, excessive force toward Mr. Pegg, tort of outrage/IIED, battery against Mr. Pegg, battery against Mrs. Pegg, and civil conspiracy, respectively) and thus Herrnberger should be granted summary judgment as to those claims. Moreover, Herrnberger argues that even under the plaintiffs' unpled extension of the stop argument, Rodriquez was a case decided in 2015 and thus was not clearly established law at the time of the stop of the

Peggs in 2012.  Klempa's briefs in response reflect similar arguments.

B.  <u>Qualified Immunity: Constitutional Injury</u>

   1.  <u>Counts III and V: Unlawful Arrest and Use of Force - Mr. Pegg</u>

This Court will review the plaintiffs' claims regarding the length of the stop, validity of the arrest, and the defendants' use of force altogether in this section.

   a. <u>Herrnberger</u>

      i.  <u>Length of Stop</u>

The United States Court of Appeals for the Fourth Circuit has found that the time reasonably required for a routine traffic stop "cannot be stated with mathematical precision.  Instead, the appropriate constitutional inquiry is whether the detention lasted longer than necessary, given its purpose."  <u>United States v. Branch</u>, 537 F.3d 328, 335 (4th Cir. 2008).  As the Fourth Circuit noted: "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."  <u>Id.</u> at 335-36 (citations omitted).  Thus, pursuant to such a stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation."  <u>United States v. Foreman</u>, 369 F.3d 776, 781 (4th Cir. 2004); <u>see also</u> <u>Rodriguez</u>, 135 S. Ct. at 1615; <u>Branch</u>, 537 F.3d at 335-36.  Thus, "once the driver has demonstrated that he is

entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" <u>Branch</u>, 537 F.3d at 336 (citing <u>United States v. Rusher</u>, 966 F.2d 868, 876 (4th Cir. 1992)); <u>see also</u> <u>Rodriquez</u>, 135 S.Ct. at 1615.

However, "if the driver obstructs the police officer's efforts in any way . . . a longer traffic stop would not be unreasonable." <u>Branch</u>, 537 F.3d at 336 (citation omitted). On the other hand, "[o]n-scene investigation into other crimes . . . [and] safety precautions taken in order to facilitate such detours are" not considered encompassed in the mission of the initial stop. <u>Rodriquez</u>, 135 S.Ct. at 1616. The Supreme Court has thus recognized that "[h]ighway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." <u>Id.</u> (citing the difference between asking a defendant to exit a vehicle, as in <u>Mimms</u>, and prolonging a stop for a dog sniff).

### (a)  <u>Exiting the Vehicle</u>

An officer may "as a matter of course order the driver of a lawfully stopped car to exit his vehicle." <u>Id.</u> (quoting <u>Maryland v. Wilson</u>, 519 U.S. 408, 410 (1997) (citing <u>Pennsylvania v. Mimms</u>, 434 U.S. 1906 (1977)(per curiam)). This is so because an officer's decision to order suspects from the vehicle "is a valid precautionary measure designed to afford a degree of protection to

the investigating officer." <u>United States v. Taylor</u>, 857 F.2d 210, 214 (4th Cir. 1988). Moreover, the "incremental intrusion" resulting from an officer's request that an individual exit the vehicle is de minimus when compared to the legitimate concerns about the officer's safety. <u>Mimms</u>, 434 U.S. at 108-111. The same bright line rule extends to the passengers of the vehicle. <u>See Wilson</u>, 519 U.S. at 410.

In this case, it was reasonable for Herrnberger to believe that the traffic stop could be extended past the initial encounter that Klempa had with Mr. Pegg. When Herrnberger arrived, after a backup call was received from Klempa, Herrnberger testified that Klempa told him that Mr. Pegg was agitated and that he wanted to show Mr. Pegg the burned out license plate light. Based on the above cited law, it was reasonable for Herrnberger to believe that Mr. Pegg could be asked to exit the vehicle.

When Herrnberger arrived on scene, the traffic stop had not ended as Klempa was still checking Mr. Pegg's information and Mr. Pegg had not been issued a warning or citation. Further, Mr. Pegg himself testified that he was "immediately agitated" when Klempa requested his information and that when Klempa approached the vehicle he was close to the fog line and there was traffic going by at that time. Additionally, the video taken by Mrs. Pegg and the testimony of both plaintiffs shows that vehicles were passing by the stopped vehicle and that the officers would be right beside or

over the fog line on the driver's side of the vehicle. Thus, it was reasonable for Herrnberger to believe that Mr. Pegg could be asked to exit the vehicle as an "incremental intrusion" to show him the burned out license plate light and for officer safety reasons. Mimms, 434 U.S. at 108-111.

Moreover, Mr. Pegg testified that when the other officers arrived, only five minutes had passed. Thus, such a short period of time, which allowed Klempa to check Mr. Pegg's information, was not unconstitutionally long. Further, as discussed later in this opinion, it was reasonable to prolong the stop once there was probable cause to support an arrest for obstructing a police officer.

(b) Search of the Vehicle

Although the defendants argue that the plaintiffs have not made a claim regarding the search of the vehicle, this Court finds that based on the plaintiffs' incorporation paragraphs in their amended complaint (incorporating by reference their version of the facts), the search of the vehicle is an asserted claim in this action. Thus, this Court will address it.

However, this Court finds that it only needs to address the argument as applied to Klempa as there is no evidence that Herrnberger actually searched the vehicle. Neither Mrs. Pegg nor Mr. Pegg testified that they saw Herrnberger searching the vehicle or have provided other evidence to support such a finding. Mrs.

Pegg stated that Herrnberger was on the driver's side of the vehicle but that she did not see him actually search the vehicle. Furthermore, Mrs. Pegg testified that any evidence of a search was on the passenger side of the vehicle. To the contrary, Mrs. Pegg testified that there was evidence of the passenger side search based on the placement of the jalapeno peppers and the cookie crumbs bag. Mr. Pegg stated that other than Klempa's search of Mrs. Pegg's purse and of the passenger side of the car, he was unaware of a further search of the vehicle. Accordingly, a reasonable juror would not be able to find that Herrnberger was involved in any search of the vehicle.

(c) <u>Arrest</u>

Herrnberger asserts that Mr. Pegg's arrest was lawful because he failed to follow officer orders. Moreover, Herrnberger contends that the unlawful arrest claim fails because Klempa rather than Herrnberger effectuated Mr. Pegg's arrest. Additionally, Herrnberger argues that even if he arrested Mr. Pegg, Mr. Pegg's failure to exit the vehicle constituted obstruction under West Virginia law and thus he was lawfully arrested.

The plaintiffs argue that Herrnberger's use of force was objectively unreasonable because the arrest itself was unlawful as Mr. Pegg could refuse to exit his vehicle because the stop had extended past a point where the scene needed to be controlled for officer safety.

Mr. Pegg was arrested for obstructing a police officer in violation of West Virginia Code § 61-5-17(a). That section states that: "A person who by threats, menaces, acts or otherwise forcibly or illegally hinders or obstructs or attempts to hinder or obstruct a law-enforcement officer, probation officer or parole officer acting in his or her official capacity is guilty of a misdemeanor . . . ." W. Va. Code § 61-5-17(a). The West Virginia Supreme Court had held "that actual force or violence is not a necessary element of the crime of obstructing an officer as defined by West Virginia Code § 61-5-17." State v. Srnsky, 582 S.E.2d 859, 867 (W. Va. 2003). However, a defendant who is "simply asking questions" in an orderly manner is not guilty under this statute. Id. (citing State v. Jarvis, 310 S.E.2d 467, 470 (1983); Wilmoth v. Gustke, 373 S.E.2d 484, 486 (1988). The West Virginia Supreme Court curtailed this finding by finding that "the charge of obstructing an officer may be substantiated when a citizen does not supply identification when required to do so by express statutory direction or when the refusal occurs after a law enforcement officer has communicated the reason why the citizen's name is being sought in relation to the officer's official duties." Id. at 868.

Further, because an arrest is a "seizure of the person," individuals are protected from unreasonable arrests under the Fourth Amendment, and, subject to certain exceptions not present here, arrests are reasonable only if based on probable cause.

19

<u>Dunaway v. New York</u>, 442 U.S. 200, 213 (1979).  The Supreme Court has made clear that probable cause exists "when the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, that the suspect has committed, is committing, or is about to commit an offense.'"  <u>Wilson v. Kittoe</u>, 337 F.3d 392, 398 (4th Cir. 2003) (citation omitted).  Notably, a court determining whether probable cause exists must consider under the Fourth Amendment, probable cause for arrest "exists where the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  <u>Dunaway</u>, 442 U.S. at 208 n.9 (citations omitted).  And, in this regard, two factors in particular govern the determination of probable cause, namely "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct."  <u>Brown v. Gilmore</u>, 278 F.3d 362, 366-67 (4th Cir. 2002).

This Court first notes that Herrnberger did not complete the actual arrest of Mr. Pegg.  According to Mr. Pegg, Klempa was the officer who placed him under arrest.  Thus, this Court first finds that this claim fails as Mr. Pegg himself has admitted that Herrnberger was not the arresting officer.  However, this Court

will also address this argument as if Herrnberger had completed the arrest.

In this case, the conduct known to Herrnberger was that Mr. Pegg was immediately agitated when approached by Klempa, to the point that Klempa felt it necessary to call for back up. Additionally, Klempa informed Herrnberger that he wanted to show Mr. Pegg the burned out license plate light. As stated above, based on this information, Herrnberger did not violate Mr. Pegg's constitutional rights by requesting that Mr. Pegg exit the vehicle.

Mr. Pegg himself has testified that when asked to exit the vehicle he refused two commands, one from Klempa and one from Herrnberger. Thus, at that point, Mr. Pegg was hindering Herrnberger from carrying out his lawful duties. Mr. Pegg testified that he first said "No." and then the second time responded, "Why?". Although the West Virginia Supreme Court has held that mere questioning is not enough, the questioning must still be done in an orderly manner. Here, Mr. Pegg first refused without asking any questions and then asked "Why?" upon the second command. As such, it was reasonable for Herrnberger to believe that probable cause existed to arrest Mr. Pegg for obstruction given the surrounding circumstances and Mr. Pegg's failure to follow Herrnberger's lawful orders.

ii. <u>Use of Force</u>

Mr. Pegg testified that (1) Herrnberger unbuckled Mr. Pegg's seatbelt and (2) Herrnberger placed his hand on Mr. Pegg to remove him from the vehicle. However, Herrnberger testified that he does not remember placing his hand on Mr. Pegg.

Herrnberger argues that the minimal contact made by Herrnberger to Mr. Pegg's shoulder was not excessive, especially given Herrnberger's objectively reasonable belief that Mr. Pegg's actions constituted a crime. Herrnberger cites the plaintiffs' expert who himself concedes that the force used by Herrnberger to remove Mr. Pegg from the vehicle was not excessive. Further, Herrnberger asserts that the contact was minimal, that Mr. Pegg had refused the lawful orders of the police officers, and that Mr. Pegg exited the vehicle willfully.

The plaintiffs assert that the force used against Mr. Pegg to remove him from the vehicle was much more than described by Herrnberger. This issue of fact, the plaintiffs argue, supports a determination that summary judgment is not appropriate.

Force is not considered excessive if it is objectively reasonable under the circumstances facing a police officer, without regard to the officer's underlying intent. Objective reasonableness is judged from the point of view of a reasonable officer on the scene. The reasonableness of the force employed is assessed considering the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Sigman v. Town of Chapel Hill, 161 F.3d 782, 786 (4th Cir. 1998) (citing Graham v. Connor, 490 U.S. 386, 396-97 (1989)).

> This evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair. Thus, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowances for the fact that police officers are forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

Sigman, 161 F.3d at 787 (citing Graham, 490 U.S. at 396-97). A court's focus should be on the circumstances at the moment the force was used, given that officers on the beat are not often afforded the luxury of armchair reflection. Greenidge v. Ruffin, 927 F.2d 789, 791-92 (4th Cir. 1991).

The plaintiffs' expert testified at his deposition that assuming it was appropriate to arrest Mr. Pegg, the force used to effectuate the arrest was not excessive. ECF No. 50-2 at 81. Further, Mr. Pegg testified that Herrnberger's physical interaction with him included Herrnberger's unbuckling of his seat belt and grabbing Mr. Pegg's arm to remove him from the vehicle. Mr. Pegg stated that after Herrnberger's initial contact, he voluntarily left the vehicle and thereafter freely walked to the back of his

vehicle. Thereafter, Herrnberger did not have physical contact with Mr. Pegg.

Given that this Court has found that Mr. Pegg was lawfully given the request to exit the vehicle and was lawfully arrested, this Court cannot find, based on the evidence, that Herrnberger's use of force was excessive. According to Mr. Pegg's version of the facts, he was asked twice to exit the vehicle. After failing to exit the vehicle, Herrnberger then unbuckled his seat belt and physically began to remove Mr. Pegg from the vehicle. At this point, there was enough probable cause to arrest Mr. Pegg for obstruction. Thus, some force was allowable to make that arrest given Mr. Pegg's agitation, which he has testified to, and his failure to follow the officers' lawful commands to exit the vehicle. Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002) (finding that it is "well established that the right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest") (citing Saucier, 121 S.Ct. at 2160).

Further, the plaintiffs have testified that when Klempa approached the car initially he was very close to the fog line and the plaintiffs' video shows that four cars went by in the eighteen seconds of footage that encompassed Mr. Pegg being removed. Additionally, the stop took place at night on New Year's Eve. These facts support a finding that Herrnberger's actions were

reasonable given the concern for officer safety if Mr. Pegg was not removed quickly or the officers were not removed from close proximity to the fog line and approaching vehicles. Accordingly, no reasonable jury would find that Herrnberger's use of force in removing Mr. Pegg from the vehicle was excessive.

        b.    <u>Klempa</u>

In his motion for summary judgment, Klempa mirrors the arguments made in Herrnberger's motion for summary judgment:[3] the Peggs were lawfully stopped, the driver and/or passenger may be asked to exit a vehicle during a lawful stop, and Mr. Pegg refused to follow officer orders and thus obstructed the officers handling of a lawful traffic stop.

The plaintiffs' response to Klempa's motion for summary judgment asserts the same, or very similar arguments, as those provided in response to Herrnberger's motion for summary judgment.

Klempa asserts the following to the plaintiffs' counterstatement of the facts: (1) Klempa's request for backup was not based on an improper purpose, (2) Klempa had not conclusively decided to give Mr. Pegg a warning, (3) Mrs. Pegg's video and the plaintiffs' testimony supports a finding that the officers were at risk and the plaintiffs were not parked at a safe distance off the

---

[3]This Court notes that a significant amount of argument has been provided through the motions for summary judgment. This Court has attempted to avoid repeating arguments where they overlap, for all parties, as there was significant overlap throughout the motions.

road, (4) Mr. Pegg testified that he voluntarily left his vehicle rather than being "dragged" out, and (5) there are no alleged causes of action for the search of the Peggs' vehicle.

Further, Klempa argues that the stop was not unlawfully extended because the stop had not been completed even if Klempa had decided to not give Mr. Pegg a citation. Additionally, Klempa asserts that Rodriquez is distinguishable as the "mission" of the traffic stop was not only to inform Mr. Pegg that his light was out but also encompassed officer safety.

### i. Length of Stop

### (a) Exiting the Vehicle

The plaintiffs argue that Klempa's decision to call for back up and prolong the stop, past providing Mr. Pegg with a warning, was unconstitutional. However, as cited previously, an officer may request that a person exit the vehicle after a lawful traffic stop has been made based only on the initial probable cause for the traffic stop. Mimms, 434 U.S. at 108-111. In this case, Mr. Pegg stated that he was "immediately agitated" when Klempa initially interacted with him and that he did at first refuse to provide identification. Further, Klempa testified that he wanted to show Mr. Pegg the burned out license plate light and also remove himself from being close to or over the fog line. Based on the circumstances and for the same reasons as those applicable to Herrnberger, this Court finds that Klempa's request for backup and

request that Mr. Pegg exit the vehicle was not an unreasonable request and did not unlawfully prolong the traffic stop.

### (b)  Search of Vehicle

As stated previously, this Court believes that the plaintiffs have made a claim regarding the search of the vehicle.  Mrs. Pegg has testified that she provided consent for Klempa to search her purse but did not provide consent for Klempa to search the vehicle. Mrs. Pegg stated that Klempa searched the passenger side of the vehicle which resulted in him finding a bag of cookie crumbs and jalapeno peppers.  Mrs. Pegg and Mr. Pegg stated that after Klempa found the cookie crumbs he inquired into whether or not the crumbs were "shake," a term for marijuana.  Mrs. Pegg testified that the search of the vehicle occurred after Mr. Pegg had been placed in the back of Klempa's cruiser and after she had been physically searched for weapons.

"An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009) (citation omitted). Thus, an officer may search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is "dangerous" and might access the vehicle to "gain immediate control of weapons."  Michigan v. Long, 463 U.S. 1032,

27

1033 (1983) (citation omitted).  In addition, the Court may consider during a _Terry_ investigation that if the person is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. _Long_, 463 U.S. at 1051-52 (citing _United States v. Powless_, 546 F.2d 792, 795-96, _cert. denied_, 430 U.S. 910 (8th Cir. 1977)). Additionally, the Court may consider if "the suspect may be permitted to reenter the vehicle before the _Terry_ investigation is over, and again, may have access to weapons."  _Id._

As will be discussed later, Mrs. Pegg has testified that a _Terry_ frisk was performed by Herrnberger and her identification was checked.  Thereafter, a search of the passenger side of the vehicle was completed by Klempa and the vehicle was eventually released to Mrs. Pegg.  However, the plaintiffs argue that Klempa and Herrnberger's questioning of them about the cookie crumbs and their possible use of marijuana, proves that the search of the vehicle was only to try and find contraband in the vehicle.

On the other hand, the law, as cited above, allows for the search of passenger compartments and the area in which a person may have access to weapons inside.  In this case, the vehicle was released to Mrs. Pegg who had just seen her husband arrested and placed in a police cruiser.  Further, Mrs. Pegg testified that she opened the car door to ask questions of the officers.  During an emotional interaction such as the one in this case, it would be

reasonable for an officer to believe that a search of the passenger compartment that could be reached by Mrs. Pegg would ensure that Mrs. Pegg could not reach any weapons and could have the vehicle safely released to her. As such, Mrs. Pegg, because of the circumstances leading up to the search of the vehicle, could reasonably be believed to be a danger to the officers once she was allowed to reenter the vehicle. Accordingly, this Court finds that a reasonable jury would find that the search of the vehicle was not a constitutional violation.

### (c) <u>Arrest</u>

Based on this Court's analysis in its section addressing Mr. Pegg's arrest in regards to Herrnberger, this Court also finds that Klempa's actions in arresting Mr. Pegg were not violative of Mr. Pegg's constitutional rights and could not be found to have been violative by a reasonable jury.

### ii. <u>Excessive Force</u>

Klempa argues that the severity of the crime, obstruction, supports justification for the use of force and such force was reasonable. Klempa asserts that there was no "excessive force" because the only force applied was the unbuckling of Mr. Pegg's seatbelt and the force used to handcuff and escort him to the vehicle.

For the same reasons as applicable to Herrnberger, this Court finds that Klempa did not exert excessive force in effectuating the

removal of Mr. Pegg from the vehicle. Further, Klempa did not exert excessive force in handcuffing Mr. Pegg, frisking him, and putting him in Klempa's police cruiser. Again, some force may be used in executing an arrest. Brown, 278 F.3d at 369. Mr. Pegg himself testified that he was not physically harmed after being removed from his vehicle. Thus, no reasonable jury would find that the force exerted by Klempa was excessive or a violation of Mr. Pegg's constitutional rights.

      3.   <u>Count IV: Unlawful Detention and Arrest - Mrs. Pegg</u>

          a.   <u>Herrnberger</u>

Mrs. Pegg stated that the following interactions occurred between herself and Herrnberger: (1) Herrnberger had Mrs. Pegg lift her shirt to expose her midriff so that he could check for weapons in her waistband, and (2) Herrnberger completed a <u>Terry</u> frisk of Mrs. Pegg that did not include her midriff which he had already checked. Herrnberger stated that he would have completed a <u>Terry</u> frisk on Mrs. Pegg, if he in fact completed one, for officer safety.

Herrnberger asserts that Mrs. Pegg was never restrained, detained, or arrested as the vehicle was ultimately released to her and she was free to leave the scene. Herrnberger further argues that she was not unlawfully detained as the traffic stop was lawful and it was appropriate to ask her to retrieve her license before releasing the vehicle to her. Additionally, Herrnberger contends

that his interactions with Mrs. Pegg were reasonable given Mrs. Pegg's failure to follow Herrnberger's directions to remain in the vehicle and to leave the passenger side door closed. Herrnberger asserts that checking her waistband and performing a Terry frisk were reasonable actions to maintain the safety of the officers given Mr. Pegg's defiant behavior toward the officers and Mrs. Pegg's refusal to follow Herrnberger's orders to stay in the vehicle given that her husband was being arrested.

### i.   Search of Vehicle and Purse

As this Court found above, in addressing Mr. Pegg's claims, there is no evidence that Herrnberger participated in the search of the plaintiffs' vehicle or Mrs. Pegg's purse. Accordingly, this Court will only address this argument as to Klempa.

### ii.   Identification and Exit of the Vehicle

In this case, the evidence shows that Herrnberger first obtained Mrs. Pegg's identification and ran it through the system before asking that she exit the vehicle. Once he asked her to exit the vehicle, he asked her to expose her waistband so that he could do a visual check for weapons. Thereafter, he performed a pat down, or Terry frisk, along Mrs. Pegg's sides. Mrs. Pegg testified that she was uncomfortable but that Herrnberger did not cup her breasts or otherwise perform the frisk inappropriately. Mrs. Pegg has also testified that during the incident she was wearing form-fitting jeans, a top, a bra, and a jacket.

An officer may "'in the interest of personal safety,' request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure." United States v. Soriano-Jarquin, 492 F.3d 495, 500-01 (4th Cir. 2007); United States v. Vaughan, 700 F.3d 705, 710 (4th Cir. 2012). Additionally, a police officer may order a passenger to exit the vehicle because of the safety interest that attaches to officers' interactions with passengers as well as with drivers, because passengers may likewise present to officers who interrupt their journey a risk of personal harm. Maryland v. Wilson, 519 U.S. 408, 410-414 (1997). This is so because the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car[.]" Id.

Herrnberger's request for Mrs. Pegg's identification was lawful as it occurred right as Mr. Pegg was placed in the police cruiser or immediately thereafter so that the seizure was not prolonged. Soriano-Jarquin, 492 F.3d at 500-01. Further, this Court has held that the subsequent search of the vehicle did not prolong the stop past a constitutionally permissible point as an officer, in the interest of safety, must ensure that a passenger who is having a vehicle released to her does not have any weapons that could threaten officer safety. This same rationale, as is seen based on the case law cited above, applies to Herrnberger's request that Mrs. Pegg exit the vehicle.

### iii. *Terry* Frisk and Waistband Search of Mrs. Pegg

In a _Terry_ stop, an officer may detain an individual for investigatory purposes. See _Terry v. Ohio_, 392 U.S. 1 (1968). This is a seizure of the person, as the individual is not free to leave while the officer conducts further investigation. "Accordingly, to conduct a _Terry_ stop consistently with the Fourth Amendment, the officer must have a reasonably articulable suspicion that the person stopped was, is, or is about to be, engaged in criminal activity." _United States v. Melgar_, 927 F. Supp. 939, 947 (E.D. Va. 1996), _aff'd_, 139 F.3d 1005 (4th Cir. 1998) (citing _Terry_, 392 U.S. at 30). This reasonable suspicion is a "commonsensical proposition," crediting the officer's special training and experience. _United States v. Lender_, 985 F.2d 151, 154 (4th Cir. 1993). It is, moreover, a lesser showing than probable cause. _United States v. Perrin_, 45 F.3d 869, 872 (4th Cir.), _cert. denied_, 515 U.S. 1126 (1995). Thus, factors to be considered when determining whether a stop violated the Fourth Amendment include: an area's crime rate; the nature of the questionable activity observed; the time of day; any suspicious behavior of the suspect; and the practical experience of officers involved in the stop. _United States v. Lender_, 985 F.2d 151, 154 (4th Cir. 1993).

It is important to note that it is not significant that an officer does not detect a bulge in a person's clothing. Courts

recognize that a variety of common clothing can conceal a weapon without a tell-tale bulge. See United States v. Douglas, 964 F.2d 738, 740 (8th Cir. 1992) (holding that the officer acted reasonably given that the suspect "was wearing a long coat which could have concealed a weapon"); United States v. Buchannon, 878 F.2d 1065, 1067 (8th Cir. 1989) (finding that the officer "was justified in 'patting down' Buchannon . . . [because] appellant was a larger man, wearing a long winter coat which might have concealed a weapon").

Here, based on the totality of the circumstances, it was reasonable for Herrnberger to have an articulable suspicion that Mrs. Pegg may be a danger to officer safety once she exited the car or once she was allowed to leave in the vehicle.

In considering the Terry factors, there has not been any evidence regarding the crime rate of the area where the plaintiffs were stopped. However, the activity observed by Herrnberger supports a frisk. At the time he asked Mrs. Pegg to exit the vehicle and thereafter performed the frisk, Mr. Pegg had been arrested after exhibiting agitation and failing to follow officer commands. Further, Mrs. Pegg has testified that she opened the door and was yelling to the officers because they were not listening to her. Given the lead up to such actions, it would be reasonable for an officer to believe that the passenger, Mrs. Pegg, was also agitated and a risk to his safety.

34

Additionally, the time of day and the day itself is supportive of such a frisk. It was dark at the time the car was stopped and it was also New Year's Eve. Finally, Herrnberger has testified that although he does not remember performing the <u>Terry</u> frisk, he would have only done so for officer safety.

Based on the totality of the circumstances, that all of the factors weigh in Herrnberger's favor except the crime rate (because evidence was no provided by either side), this Court finds that a reasonable jury could not find that Herrnberger's physical interactions with Mrs. Pegg were constitutional violations.

### b. <u>Klempa</u>

#### i. <u>Physical Interaction with Mrs. Pegg</u>

Klempa asserts that the same arguments apply to Mrs. Pegg as against Mr. Pegg. Klempa further adds that Mrs. Pegg was neither arrested or charged, and that no allegations have been made that Klempa had any physical contact with her or was the one who ordered her to exit the vehicle.

Mrs. Pegg has only testified that Herrnberger physically interacted with her and thus this Court has only reviewed this allegation in regards to Herrnberger (above).

#### ii. <u>Search of Vehicle and Mrs. Pegg's Purse</u>

This Court has already addressed the search of the vehicle and incorporates those findings here. It will now consider Klempa's search of Mrs. Pegg's purse.

The plaintiffs assert that Klempa failed to discuss the search of Mrs. Pegg's purse. The plaintiffs contend that the search of Mrs. Pegg's purse was intrusive and unreasonable because the officers had no basis for believing that contraband would be found. The plaintiffs argue that the officers rifled through Mrs. Pegg's purse.

Mrs. Pegg testified that she provided consent for the search of her purse. An individual waives his reasonable expectation of privacy when he voluntarily consents to a search, and the ensuing search comports with the Fourth Amendment to the extent that it is consistent with the consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Whether consent is voluntarily given, as opposed to coerced by law enforcement pressure, is judged by the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 557 (1980) (citing Schneckloth, 412 U.S. at 227). Factors to consider in this analysis include the location of the encounter; the number of officers and suspects present; whether the officers displayed their weapons; whether there was physical contact; whether the officers used language or a tone of voice indicating threats or compulsion; the subjective state of mind, age, and intelligence of the consenting party; the length of the detention; and the individual's knowledge of his right to refuse consent. United States v. Watson, 423 U.S. 411, 424 (1976).

This Court finds that it is unclear whether Mrs. Pegg's consent was voluntarily given. One factor that weighs in Mrs. Pegg's favor is that she testified that Herrnberger told her that she would be arrested, like her husband, if she did not shut her door. Mrs. Pegg had opened her door to inquire into why the officers were arresting her husband, and Herrnberger then returned to the vehicle where Mrs. Pegg was still sitting and told her to shut her door or she might be arrested, that Mr. Pegg was being arrested because he did not do what the officers told him to do, and that officers "do things for our safety and for yours . . . ." Id. at 50-52. Further, there was physical contact between Mrs. Pegg and Herrnberger when she was frisked. Additionally, Mrs. Pegg was likely in an emotional state at this time after watching her husband be arrested. Mrs. Pegg is an adult and of reasonable intelligence to consent as she has testified that she completed an associate's degree. The length of the detention was also short, as Mr. Pegg testified that it was approximately twenty minutes.

The other factors, however, do not weigh in Mrs. Pegg's favor. The location of the search was not in an enclosed space, it was cold but there is no evidence that the temperature was unbearable, and the search was conducted away from the fog line where vehicles were passing by. Further, there is no evidence that the officers displayed their weapons at any time and the officers only outnumbered the plaintiffs by one.

Given the factors in Mrs. Pegg's favor, it is unclear what her subjective state of mind was at the time she was asked for consent to search her purse or her knowledge of her right to consent after being told by Herrnberger that she needed to do what the officers told her to do.

However, this Court has previously found in this order that Mrs. Pegg could be physically searched and the passenger compartment searched giving the fact that she was upset because her husband had been arrested, Mr. Pegg had displayed agitation, and Mrs. Pegg had failed to initially follow Herrnberger's order to close her door. Thus, this Court finds that even without Mrs. Pegg's consent, Klempa was reasonable in searching Mrs. Pegg's purse to ensure officer safety at that time.

"[P]assengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars, which trave[l] public thoroughfares, seldom serv[e] as ... the repository of personal effects, are subjected to police stop and examination to enforce pervasive governmental controls [a]s an everyday occurrence, and, finally, are exposed to traffic accidents that may render all their contents open to public scrutiny." Wyoming v. Houghton, 526 U.S. 295, 303, (1999) (internal citations and quotations removed).

As passengers are subject to a lower expectation of privacy, and for the same reasons as reviewed by this Court for allowing the

search of the passenger compartment, Klempa was reasonable in searching Mrs. Pegg's purse. To reiterate, the vehicle was eventually released to Mrs. Pegg and the steps taken by the officers, the searches and the checking of her identification, made the release of that vehicle safe. As such, this Court finds that Klempa did not violate Mrs. Pegg's constitutional rights by searching her purse.

### 5. Fourteenth and First Amendment Claims

#### a. Fourteenth Amendment Claims

Herrnberger argues that any Fourteenth Amendment claim must fail as Mr. Pegg has admitted that no inappropriate action occurred after he was arrested and Fourteenth Amendment claims only cover post-arrest and/or pretrial detainee situations. Klempa's arguments mirror those of Herrnberger as outlined above. Klempa also adds that due to his lack of contact with Mrs. Pegg these claims clearly fail as to Mrs. Pegg.

Section 1983 is not a stand alone claim and must be asserted in conjunction with substantive federal rights provided for elsewhere in the law. Albright v. Oliver, 510 U.S. 266, 271 (1994). Thus, "analysis of an excessive force claim brought under § 1983 begins with identifying the specific constitutional right allegedly infringed by the challenged application of force." Sawyer v. Asbury, 537 F. App'x 283, 290 (4th Cir. 2013) (quoting Orem v. Rephann, 523 F.3d 442, 445 (4th Cir. 2008) (internal

citation and quotation omitted)). The Fourth Circuit has thus held that "claims of post-arrest excessive force against an arrestee or pre-trial detainee, as here, are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits before conviction the use of excessive force that amounts to punishment." Sawyer, 527 F. App'x at 290 (citation and internal quotation omitted).

In this case, the plaintiffs have not made any claims regarding post-arrest excessive force or any excessive force that amounted to punishment. Mrs. Pegg was never arrested. Further, Mr. Pegg has testified that he was not harmed other than the allegations he has made regarding exiting the vehicle. Accordingly, the plaintiffs' Fourteenth Amendment claims are unfounded and no reasonable jury could find that the defendants committed such a constitutional violation.

> b. First Amendment Claims

Herrnberger asserts that the plaintiffs have failed to provide any evidence, other than their own beliefs, that their First Amendment rights were infringed upon. Further, Herrnberger reiterates that there is no evidence that the stop was extended for an unlawful purpose, namely to search for illegal drugs. Herrnberger argues that Mr. Pegg was arrested for repeatedly refusing to follow law enforcement officers' orders and not because he was verbally opposing the police officers.

The plaintiffs argue that Mr. Pegg's First Amendment rights were infringed upon when the search was unlawfully extended and Mr. Pegg was taken from his vehicle because he challenged the unlawful extension and then his arrest. The plaintiffs assert that verbal criticism of police officers is clearly protected by the First Amendment.

Klempa argues that the plaintiffs have offered no evidence that Mr. Pegg was arrested because he was asserting his First Amendment rights. To the contrary, Klempa asserts that Mr. Pegg was arrested because he repeatedly refused the lawful order of the officers. Klempa contends that the plaintiffs have offered no response as to Mrs. Pegg's First Amendment claims.

In Reichle, the Supreme Court specifically addressed a qualified immunity defense as applied to a claim such as Mr. Pegg's claim raised in this action:

> Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause. This Court has never held that there is such a right.

Reichle v. Howards, 132 S. Ct. 2088, 2094 (2012). Further, that same court has held that where "the officer . . . decide[s] to arrest the suspect because his speech provides evidence of a crime or suggests a potential threat" the connection between the officer's alleged animus and the alleged constitutional injury is weakened. Id. at 2095.

This Court has found that Mr. Pegg's arrest was supported by probable cause. Because a right to be free from a retaliatory arrest that is otherwise supported by probable cause has not been held by the Supreme Court to exist, Mr. Pegg's argument fails. Further, even if such a right existed, the evidence shows that the officers in this case reasonably believed that Mr. Pegg's speech was a threat and obstructed their investigation. As such, there is no evidence that there is a causal relationship between any protected speech and the officers' actions. Accordingly, no reasonable juror could find that Mr. Pegg's First Amendment rights were violated.

The same is true for Mrs. Pegg. Mrs. Pegg was not arrested and the plaintiffs have not expanded upon their reasoning for upholding a First Amendment claim for Mrs. Pegg. However, if related to the allegations regarding Herrnberger's physical interaction with her and Klempa's search of the vehicle, this Court has found that such actions were reasonable. Further, there is no evidence that those actions were taken because Mrs. Pegg asked questions of the officers rather than for the officer's own safety. Accordingly, this claim fails as well.

C.  Qualified Immunity: Clearly Established

This Court has already found that one prong of Saucier, the constitutional violation prong, has not been met. The Court notes that it has applied Rodriquez in doing so although Rodriquez, a

2015 case, was not clearly established law at the time of the 2012 offense. Accordingly, this Court finds that the defendants' conduct does not constitute a constitutional violation under clearly established law.

D.  Qualified Immunity: Willful and Intentional – State Law Claims

Based on the same reasons forwarded for qualified immunity regarding the federal law claims, Herrnberger and Klempa assert that the plaintiffs' state law claims fail because they are entitled to qualified immunity as to those claims as well. The plaintiffs assert that their arguments regarding the federal claims are applicable here as well.

This Court incorporates its findings that a constitutional injury did not occur as the defendants' actions were reasonable pursuant to clearly established law. This Court further finds that the defendants' actions were not "fraudulent, malicious, or otherwise oppressive" to the plaintiffs. West Virginia Reg'l Jail & Corr. Facility Auth., 766 S.E.2d at 762.

As stated above, the stop of Mr. Pegg was lawful and the defendants' actions thereafter were reasonable given the stop, later arrest of Mr. Pegg, and need to ensure officer safety. There is no evidence that the officers' actions were fraudulent, malicious, or otherwise oppressive to the plaintiffs.

The plaintiffs have pleaded in their amended complaint that the officers' actions were malicious and intentional. Mrs. Pegg

has testified that the officers made disparaging remarks about her husband's profession and about the possible drug usage of her father-in-law. However, a threatening tone or rude remarks do not, taken alone, raise an officer's conduct to the level of a constitutional violation. <u>Carter v. Jess</u>, 179 F. Supp. 2d 534, 546 (D. Md. 2001)(finding that even where a police officer's conduct was "hardly in keeping with the behavior, decorum, professionalism, and restraint that the public expects from law enforcement," an arrestee's conduct "not indicative of someone inclined to obey a lawful order" outweighs such conduct). Thus, this Court finds that the plaintiffs have not provided any evidence to support such claims and a reasonable jury could not find in their favor on such claims. Thus, this Court finds that as to the constitutional state law claims, the defendants are also entitled to qualified immunity.

E.    <u>State Law Claims</u>

   1.    <u>Count VI: Tort of Outrage/Intentional Infliction of Emotional Distress</u>

Under West Virginia law, intentional infliction of emotional distress, or the tort of outrage, requires proof of the following four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional

44

distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Beasley v. Mayflower Vehicle Sys., Inc., No. 13-0978, 2014 WL 2681689, at *4 (W. Va. June 13, 2014) (citing Syl. Pt. 3, in part, Travis v. Alcon Labs., Inc., 202 W. Va. 369, 504 S.E.2d 419 (1998)).   This Court must "determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress.   Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination."   Id.   "An intentional infliction claim 'is a difficult fact pattern to prove.'"   Beasley, 2014 WL 2681689, at *4 (citing Hines v. Hills Dep't Store, Inc., 193 W. Va. 91, 96, 454 S.E.2d 385, 390 (1994)).

Based on this Court's analysis above, this Court has found that the defendants' conduct was lawful and reasonable given the circumstances.   Thus, this Court finds that there is no basis that the officers' actions were outrageous so as to support a finding, which the West Virginia Supreme Court has held is a difficult one, that the plaintiffs are entitled to relief under this claim.   The officers acted based on Mr. Pegg's conduct which led to an arrest for obstruction and the need to ensure officer safety so that the vehicle could be released to Mrs. Pegg.   As such, a reasonable juror could not find that the plaintiffs are entitled to relief for

the intentional infliction of emotional distress claim they have forwarded.

    2.   <u>Count VII: Battery: Mr. Pegg</u>

Klempa asserts that the battery claim is unfounded as the use of force was lawful because Mr. Pegg had obstructed the police officers. Further, Klempa argues that he did not have the requisite intent to commit a battery. Herrnberger mirrors these same arguments.

The West Virginia Supreme Court has cited the Restatement (Second) of Torts, § 13 (1965)'s recitation of the elements of the tort of battery:

> An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

<u>West Virginia Fire & Cas. Co. v. Stanley</u>, 602 S.E.2d 483, 494 (W. Va. 2004). Further, that court has found that "[i]n order to be liable for a battery, an actor must act with the intention of causing a harmful or offensive contact with a person." <u>Id.</u> (citation omitted).

Both defendants had contact with Mr. Pegg. However, the contact with Mr. Pegg was not unlawful and there is no evidence that Mr. Pegg was actually harmed by the contact. Further, such contact was not offensive as the officers did not use excessive force in this action. Thus, this claim must also fail.

46

3.   Count VIII: Battery: Mrs. Pegg

The plaintiffs assert that the search of Mrs. Pegg's person was an offensive illegal physical contact that is civilly actionable under West Virginia's battery statute.   Herrnberger contends that the plaintiffs have failed to support an argument that the alleged frisk of Mrs. Pegg was unlawful or that Mrs. Pegg was ever handcuffed, restrained, or arrested.   Klempa argues that because he neither arrested Mrs. Pegg nor had any physical contact with Mrs. Pegg this claim is unsupported as asserted against him.

This Court first finds that any claim directed toward Klempa regarding a battery of Mrs. Pegg fails as there is no evidence that any contact occurred between Klempa and Mrs. Pegg.   Thus, the second element for battery is not present.  Stanley, 602 S.E.2d at 494.   Further, for the reasons stated previously in this order, this Court finds that Herrnberger's physical contact with Mrs. Pegg was not unlawful or harmful to Mrs. Pegg.   Although Mrs. Pegg may have been uncomfortable, the frisk of Mrs. Pegg was done for officer safety and thus does not constitute a battery.

4.   Count IX: Civil Conspiracy

The West Virginia Supreme Court provides the following regarding a claim for civil conspiracy:

> a civil conspiracy is a combination of two or more
> persons by concerted action to accomplish an unlawful
> purpose or to accomplish some purpose, not in itself
> unlawful, by unlawful means.  The cause of action is not
> created by the conspiracy but by the wrongful acts done
> by the defendants to the injury of the plaintiff.

47

_Dixon v. Am. Indus. Leasing Co._, 253 S.E.2d 150, 152 (W. Va. 1979) (citing 16 Am.Jur.2d, Conspiracy, Sec. 44). As this Court has found that neither of the defendants engaged in an unlawful manner, for unlawful purpose, or by unlawful means, the plaintiffs' civil conspiracy claim must fail. Thus, a reasonable jury could not find that the civil conspiracy claim would stand as it cannot be asserted without an underlying unlawful act.

## V. Conclusion

Based on the analysis above, this Court finds that the plaintiffs' partial motion for summary judgment (ECF No. 49) is DENIED. Further, defendant Grant Herrnberger's motion for summary judgment (ECF No. 50) and defendant Nathan Tyler Klempa's motion for summary judgment (ECF No. 51) are GRANTED. As such, the parties' motions in limine (ECF Nos. 42, 43, 44, 45, 46, 47) are DENIED AS MOOT. It is ORDERED that this case be DISMISSED WITH PREJUDICE and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:     July 31, 2015


                          /s/ Frederick P. Stamp, Jr.
                          FREDERICK P. STAMP, JR.
                          UNITED STATES DISTRICT JUDGE